UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Heather A. Nunn,

    Plaintiff,

v.                                          Civil No. 09-1286 (JNE/JJK)
                                              ORDER

Noodles & Company, a Delaware
Corporation and Zurich American
Insurance Company, a New York
Corporation,

    Defendants.

---

Benjamin A. Lavoie, Esq., and James E. Lindell, Esq., Lindell & Lavoie, LLP, appeared for Plaintiff Heather A. Nunn.

Bryan T. Symes, Esq., and Gregory L. Peters, Esq., Seaton, Beck, & Peters, PA, appeared for Defendant Noodles & Company.

Jo Ann Strauss, Esq., Cousineau McGuire Chartered, and William L. Davidson, Esq., Lind, Jensen, Sullivan, & Peterson, PA, appeared for Defendant Zurich American Insurance Company.

---

      Plaintiff Heather Nunn asserts a claim for intentional obstruction of workers' compensation benefits under Minnesota Statutes section 176.82 against Defendants Noodles & Company (Noodles) and Zurich American Insurance Company (Zurich). Before the Court are four motions for summary judgment: (1) Noodles' motion for summary judgment on Nunn's claim; (2) Zurich's motion for summary judgment on Nunn's claim; (3) Nunn's motion for summary judgment on Defendants' liability for her claim; and (4) Zurich's motion for partial summary judgment on Noodles' professional negligence crossclaim. For the reasons explained below, the Court denies Nunn's motion, grants Defendants' motions on Nunn's claim, and grants Zurich's motion on Noodles' crossclaim.

1

# I. BACKGROUND

This case arises out of Nunn's claim for workers' compensation benefits against her employer, Noodles, and its insurer, Zurich. Nunn was injured on the way to a Noodles coworker's home. She successfully argued to a Minnesota workers' compensation judge that she was injured while furthering Noodles' interest and while acting within the scope of her employment, and the judge awarded workers' compensation benefits to her. Under Minnesota law, workers' compensation is generally the exclusive remedy for injured workers. Section 176.82, however, provides an additional remedy where an employer intentionally obstructs recovery of workers' compensation benefits. Nunn asserts such a claim here.

## A. Memorial Day meeting

On May 28, 2007, just before 10 p.m., Nunn clocked out from work at Noodles and left for the home of coworker Raymond Gibson. During her motorcycle ride to Gibson's home, she ran a red light and sustained severe injuries, recovery from which took a considerable amount of time. Gibson intended to host a Memorial Day meeting at his home. He was the general manager of the Noodles restaurant where Nunn worked, and he was Nunn's supervisor. Tom Mako, the restaurant's assistant manager, was also going to attend the meeting at Gibson's home. The nature of the meeting, social or business, was central to the underlying compensation case. Nunn urged that her claim was compensable because the meeting was entirely for business purposes. Defendants' theory of the case was that the meeting was a mix of business and social purposes. The bulk of the evidence of the meeting's nature came from the testimony of the meeting's three planned participants, Nunn, Gibson, and Mako. Ultimately, the evidence supporting the parties' opposing contentions was mixed. Gibson and Mako testified that the meeting mixed business and social purposes and included discussions of work and social affairs

as well as drinking. Nunn maintained that it was a mandatory work meeting with no social aspects.

**B.     Initial investigation and denial of Nunn's claim**

Three weeks after the accident, Nunn submitted a claim to Zurich, Noodles' insurer, asserting that she was owed workers' compensation benefits because she was on her way to attend a mandatory work meeting. Tara Draves-Blandin investigated the claim for Zurich. As part of her investigation, she interviewed Gibson. During the interview Gibson stated that the meeting was not mandatory. He initially stated that the meeting "was work." But after being interrupted by Draves-Blandin, he clarified that it was "[w]ork plus additional things" and agreed that the meeting was "work and personal." He also stated that he could not say how Nunn perceived the meeting. The interview was recorded and was not produced to Nunn until discovery in this litigation. Patrick Grove, Defendants' trial counsel in the compensation case, testified about the recorded statement. His testimony was equivocal. First, he stated that the transcript was put in the case file at some point after he took over the case but before the compensation hearing. Later in his deposition, he testified that he did not recall seeing the statement in the file.

Draves-Blandin also spoke to management personnel at Noodles while investigating the claim. Kathy Lockhart, a vice president at Noodles, stated that she was not sure whether workers' compensation benefits should be denied and asked for further investigation. Noodles' area manager, Mary Beth Pfeifer, wrote to Draves-Blandin stating that the meeting was not work related and that Nunn was going to Gibson's home for a social gathering. After speaking with Gibson and Pfeifer, John Puterbaugh, Noodles' Vice President of Human Resources, told Draves-Blandin that the meeting was not mandatory; that Nunn was to be a part of a team

opening a new store; that there was to be no drinking; and that, at past gatherings, participants informally discussed work issues. During her investigation, Draves-Blandin noted that the meeting was a mix of social and work functions, that it was not mandatory, and that Nunn was not paid for attending the meeting. After consulting with Zurich's attorney, Kris Maland, Draves-Blandin issued a notice denying liability.

**C.     Discovery during the workers' compensation litigation**

Nunn deposed both Gibson and Mako during the workers' compensation litigation. Gibson testified that the Memorial Day meeting was to include discussions of several work-related topics, including Mako's and Nunn's work roles during the summer and several specific problems the two were having at work. But Gibson also testified that meetings with Noodles coworkers often had dual social and business purposes. He testified that Nunn voiced no specific objection to the meeting even though she had plans with her boyfriend that night. Gibson further testified that the meeting was going to have business and social aspects, that it was to take place after Nunn clocked out and at his home, and that no one expected to be paid. Gibson also testified, in contrast to Puterbaugh's impression described above, that there was drinking at the meeting and that Gibson and Mako socialized the night of the accident.

Mako described the business purposes of the meetings, including how to be a better manager, strategies for the upcoming summer, and Nunn's and Mako's new management roles. Mako explained that though the meeting was not mandatory and he was not compensated, he considered it worthwhile because discussing work with Gibson was an opportunity to improve his work skills and strengthen his position at Noodles. Mako also stated that he and Gibson talked socially before Nunn's anticipated arrival. Mako further testified that Nunn objected to

4

the meeting because she wanted to spend the evening with her boyfriend. Nunn's boyfriend testified to the same.

After Gibson's and Mako's depositions, Maland estimated that Defendants had a 20% chance of success. In mid-November, Maland proposed to Nunn that they settle the case. After Grove took the case over, he offered to participate in mediation with Nunn. Nunn refused.

Defendants deposed Nunn. She testified that the Memorial Day meeting was a mandatory off-site meeting and that if she did not attend she probably would have been reprimanded and written up. She stated that managers are paid for attending such meetings and that only work issues are discussed. She also testified that there was no drinking at off-site meetings except one time when Gibson had a beer at a restaurant. She further stated that off-site meetings were announced in a computerized managers' log. Nunn admitted that she texted Gibson and encouraged him not to attend his deposition in the workers' compensation case. Grove wrote that, when he confronted Nunn with this fact during her deposition, she began crying. Grove concluded that while Nunn was likable and would make a good witness, her testimony was not completely credible.

**D.     Workers' compensation hearing and decision**

Just weeks before the hearing, Grove met with Gibson, Mako, and Pfeifer. In a letter to Zurich, Grove complained that Mako was focusing on the business aspects of the Memorial Day meeting and could not identify a single social aspect of it. Grove also stated that Gibson's and Mako's testimony had not been consistent and that he was having problems dealing with their testimony because it "continue[d] to change."

At the administrative hearing, Gibson testified that a primary purpose of the meeting was business, but the meeting had social aspects. In contrast to his deposition, Gibson testified at the

5

hearing that Nunn objected to going to the meeting because she wanted to go to a party. Gibson testified that he encouraged her to come to the meeting because she had already committed to it. Mako testified as to the mixed social and business purposes of the meeting. Although he testified that the social aspects of the anticipated meeting were similar to other off-site meetings, Mako reaffirmed his deposition testimony which outlined the work issues that he expected would be discussed. Grove offered the deposition of Sean McLoughlin. In offering the deposition, Grove stated that McLoughlin discussed the Memorial Day meeting with Nunn. McLoughlin's deposition testimony stated, however, that he had not spoken with Nunn about the nature of the meeting.

The compensation judge held that the trip to Gibson's home "arose out of and in the course and scope of employment." In arriving at that conclusion, the judge applied the special errand rule and the dual purpose doctrine. Under the special errand rule, the compensation judge found that (1) Gibson requested Nunn's attendance at the meeting; (2) the meeting was held after Nunn's fixed work hours; and (3) the meeting was related to employment but such meetings were not a regular part of Nunn's job duties. Under the dual purpose doctrine, the trip would be compensable even if it had social and business purposes so long as the employee's work necessitated the trip, and the trip would have been made even in the absence of the social purpose. The judge held that the trip was compensable under this rule. The judge determined that Gibson's testimony was not entirely credible. For example, Gibson testified that if the meeting had been mandatory it would have been held at the Noodles restaurant. The judge discredited this testimony because other employees described previous mandatory off-site meetings. The judge also found that Gibson provided "untruthful information and misinformation" to Zurich. Accordingly, the judge found that the meeting was most likely

mandatory, that there was a business agenda including a discussion of Nunn's new management position, and that it was primarily, if not entirely, a business meeting. The judge therefore awarded Nunn the claimed benefits as well as a partial reimbursement of attorney fees under Minnesota Statutes section 176.081, subdivision 7. The judge did not, however, sanction Defendants under Minnesota Statutes section 176.225, which requires a penalty of up to 30% of the compensation amount where an employer unreasonably delays, denies, or frustrates the payment of benefits.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* Here, that substantive standard of proof is clear and convincing evidence.

### A. Nunn's intentional obstruction claim

Minnesota's workers' compensation laws are intended "to assure the quick and efficient delivery of indemnity and medical benefits to injured workers at a reasonable cost to the employers who are subject to the provisions of this chapter." Minn. Stat. § 176.001 (2008). To effect this goal, "[e]mployees' rights to sue for damages over and above medical and health care benefits and wage loss benefits are to a certain degree limited . . . and employers' rights to raise common law defenses such as lack of negligence, contributory negligence on the part of the employee, and others, are curtailed as well." *Id.* Accordingly, workers' compensation is generally the exclusive remedy for an injured worker. *Id.* § 176.031; *Minter v. Ford Motor Co.*, 827 F. Supp. 1418, 1424 (D. Minn. 1993). In some circumstances, however, there is an additional remedy where employers obstruct or interfere with the recovery of benefits. *See Bergeson v. U.S. Fidelity and Guar. Co.*, 414 N.W.2d 724, 726-27 (Minn. 1987).

Section 176.82 states:

> Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages incurred by the employee including any diminution in workers' compensation benefits caused by a violation of this section including costs and reasonable attorney fees, and for punitive damages not to exceed three times the amount of any compensation benefit to which the employee is entitled. Damages awarded under this section shall not be offset by any workers' compensation benefits to which the employee is entitled.

Minn. Stat. § 176.82, subd. 1 (2008). Section 176.82 is separate from the penalties provided under the workers' compensation system and is "intended to cover those situations where the insurer's delay or denial of benefits goes beyond unreasonableness, neglect, or obstinance." *Bergeson*, 414 N.W.2d at 727. A section 176.82 violation occurs when "a person, such as an insurer, obstructs or hinders . . . the receipt of benefits due the injured worker and does so in a

manner that is outrageous and extreme, or, to put it another way, in a manner which is egregiously cruel or venal." *Id.* Under *Bergeson*, "[t]he insurer must also desire, for unworthy motives, to deprive the injured worker of benefits." *Id.* at 728. A plaintiff must prove a section 176.82 claim by clear and convincing evidence. *Id.* at 727.

The thrust of Nunn's argument is that Noodles and Zurich are liable under section 176.82 because they maintained a defense that they knew was unfounded. An unfounded refusal to pay compensation may form the basis of an actionable section 176.82 claim. *Kaluza v. Home Ins. Co.*, 403 N.W.2d 230, 233-34 (Minn. 1987). Nunn asserts that Defendants violated section 176.82 "by conspiring to present to the workers' compensation judge a defense premised on a deliberate lie." (Pl.'s Mot. Br. 32.) That lie, according to Nunn, is the "false characterization" of the Memorial Day meeting as having social purposes. Importantly, the issue before the Court is not whether a reasonable jury could conclude that the meeting was primarily business or primarily social. Instead, the issue is whether a reasonable jury could conclude by the relevant standard—clear and convincing evidence—that Defendants were egregiously cruel or venal because they maintained the defense that the social aspects of the meeting justified denying Nunn's claim.

No reasonable jury could so conclude from this record. Notwithstanding Nunn's assertions to the contrary, Gibson and Mako offered consistent testimony that the meeting had both business and social purposes. And while the exact characterization of the balance of these purposes varied and the testimony may or may not have been embellished to some extent, the basic proposition that the meeting was of mixed purpose was constant. Nunn attempts to reduce the issue in the underlying litigation to an either-or proposition: either the meeting was work or it was social. According to Nunn, because Defendants "knew" it was work related, Defendants

9

violated section 176.82 by fighting the claim.  The record does not support this position.  Much of the evidence in the underlying case supports the conclusion that the meeting had mixed social and business purposes.  And many of the inconsistencies in the witnesses' testimony derive from counsel's attempt to box the witnesses into a position that the meeting was an either-or affair.  Gibson and Mako planned on discussing several specific work issues, and there is evidence that Nunn tried to get out of the meeting but Gibson cajoled her into coming.  The meeting, however, took place after Nunn had clocked out, and it was held at Gibson's home.  There was little evidence that any of the participants expected to be paid.  But there was evidence that the meeting participants planned on drinking, that they did, in fact, drink, and that the group frequently mixed business with socialization.  As the compensation judge pointed out, Gibson's testimony was not entirely credible and he might have been biased by a desire to avoid trouble with Noodles, his employer.  But Nunn's deposition testimony was not entirely credible either, and it is entirely possible that she was embellishing.  For example, aside from her assertion to the contrary, there is no evidence that she was to be paid for attending the meeting.  Moreover, as highlighted above, she encouraged Gibson not to attend his deposition and began crying when confronted on that point.  Under these facts, a jury could not conclude that the meeting's purpose was black as opposed to white or that Defendants "knew" that it was so work related that Nunn's claim was undeniably compensable.  The fact that the compensation judge did not award penalties further supports this conclusion.[1]

      Nunn also argues that Noodles is liable because Lockhart "had no idea what the truth was" and "never considered forbidding Gibson and Mako from testifying in opposition to

---

[1] At the motion hearing, Plaintiff stated that she did not ask the compensation judge for these penalties.  But the penalties are mandatory and only require that the employer be given notice and an opportunity to be heard.  Minn. Stat. § 176.225 (2008).  Accordingly, the compensation judge likely could have imposed the penalties sua sponte.

Nunn's claim." (Pl.'s Mot. Br. 37.) It is certainly possible to conclude these facts from the record. The Court is at a loss, however, as to why this amounts to egregiously cruel or venal conduct. If Lockhart did not "know what the truth was" then she did not know whether Nunn's claim was compensable. This cuts against Nunn's intentional obstruction claim. Where an employer is unsure of a claim, it is far from egregiously cruel or venal behavior to allow the claim to work its way through the workers' compensation administrative system. Indeed, such a course of action seems squarely within the legislative intent of Minnesota's workers' compensation laws.

Nunn makes several arguments against Zurich specifically. She argues that the failure to produce Gibson's initial statement in the underlying compensation case is evidence of Zurich's bad faith. But the initial statement is not inconsistent with Gibson's other statements: the meeting was not mandatory and was a mix of business and social purposes. It is unlikely that the failure to produce the statement was intentional, because the statement is largely redundant evidence that the meeting had a mixed purpose. Moreover, the statement might well have helped Gibson's credibility because it cuts against the compensation judge's conclusion that Gibson initially provided untruthful information to Zurich. Nunn also asserts that Grove's offering of and vouching for McLoughlin's deposition is evidence of intentional obstruction. Nunn argues that Grove incorrectly stated that McLoughlin spoke with Nunn about the nature of the meeting. But this problem was aired during the hearing and the deposition testimony itself contradicted what Grove said. After reading the deposition, the compensation judge stated that it had no probative value and concluded that McLoughlin had no personal knowledge of the meeting's nature. A jury is therefore unlikely to conclude that Grove was trying to lie to the compensation judge about the testimony rather than that Grove simply made an honest mistake. Nunn also

11

argues that Zurich violated section 176.82 by "woodshedding" Gibson and Mako before the hearing. According to Nunn, Grove improperly coached his witnesses by explaining that Defendants' theory of the case was that the meeting was sufficiently social to rule out workers' compensation. Sharing this theory with the witnesses does not amount to outrageous, egregiously cruel, or venal conduct. There is no evidence that Grove instructed witnesses to lie. Defining the line between preparing witnesses by informing them of a legal theory and improper coaching is a nuanced legal issue, *see, e.g.*, Stephen M. Goldman & Douglas A. Winegardner, *Behind Closed Doors: Preventing False Deposition Testimony*, Litigation, Summer 2010, at 42, and the record contains no expert testimony suggesting that Grove crossed that line. Although the record could allow a jury to conclude that Grove may have overemphasized the consequences of highlighting the social aspects of the meeting, a jury, based on its lay knowledge, could not conclude that he crossed the line into improper coaching.

The purposes behind Minnesota's workers' compensation laws also support Defendants. As stated above, Minnesota's workers' compensation statutes are designed to "assure the quick and efficient delivery of indemnity and medical benefits to injured workers at a reasonable cost to the employers." Minn. Stat. § 176.001. The statutory scheme attempts to strike a balance. Employees profit from the speedy delivery of benefits, but they are unable to recover many types of damages. For their part, employers benefit because they are insulated from having to pay certain types of damages, but they are unable to maintain many of their common law defenses. The Minnesota Legislature adjusted this balance by establishing an intentional obstruction claim under section 176.82 as a safety valve for the truly exceptional case. *See Bergeson*, 414 N.W.2d at 726-27. Allowing this safety valve to open courts to unexceptional claims would undermine

the careful balance struck by the Legislature and the purposes behind Minnesota's workers' compensation laws.

Because a reasonable jury could not conclude from this record that Defendants are liable under section 176.82, the Court grants Defendants' motions for summary judgment bearing on Nunn's claim and denies Nunn's motion for partial summary judgment.

**B.     Noodles' crossclaim**

Zurich moves for partial summary judgment on Noodles' crossclaim to the extent that Noodles alleges that Maland and Grove were negligent in their representation of Noodles. Zurich argues that Noodles has failed to comply with Minnesota Statutes section 544.42 because Noodles neither provided an initial expert affidavit stating that the Zurich attorneys' conduct fell below the applicable standard of care, nor served Zurich with an affidavit listing Noodles' testifying experts. Because Noodles has not put forth any expert evidence, Zurich also contends that Noodles cannot establish a prima facie case of legal malpractice. Noodles responds that its negligence claim against the Zurich attorneys does not require expert testimony. Because Noodles cannot maintain its malpractice claims without expert testimony, the Court grants Zurich's motion.

An actionable legal malpractice claim requires "'(1) the existence of an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages; [and] (4) that but for defendant's conduct, the plaintiff would have been successful in the prosecution or defense of the action.'" *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn. 2006) (quoting *Blue Water Corp. v. O'Toole*, 336 N.W.2d 279, 281 (Minn. 1983)). Expert testimony is generally required to establish the standard of care, its breach, and proximate cause. *Id.* at 817;

13

*Walton v. Jones*, 286 N.W.2d 710, 715 (Minn. 1979); *Fontaine v. Steen*, 759 N.W.2d 672, 677 (Minn. Ct. App. 2009). "However, such expert testimony is not necessary when the matters to be proven are within the area of common knowledge and lay comprehension." *Hill v. Okay Constr. Co.*, 252 N.W.2d 107, 116 (Minn. 1977).

Noodles alleges that the Zurich attorneys were negligent because: (1) they were not familiar with and did not use Gibson's initial statement; (2) they did not produce the statement to Nunn until discovery in this litigation; and (3) Maland failed to adequately prepare Gibson and Mako for their depositions. Noodles argues that a jury could conclude that these three acts and omissions constitute malpractice without expert testimony. But expert testimony is needed to show causation for the first two points. Noodles seeks damages for any award that Nunn might receive in this case and the attorney fees associated with defending this case. Accordingly, Noodles must demonstrate that failing to use and disclose the Gibson statement was the proximate cause of this lawsuit. A jury could not come to this conclusion without the aid of expert testimony. A jury would also require expert testimony on the third point, because the standard of care that applies to the preparation of Mako and Gibson for their short, half-hour depositions is not within the arena of common knowledge and lay comprehension. Because the record contains no expert testimony on these points, Noodles has not met its burden of showing a genuine issue of material fact for trial on these claims.[2]

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

---

[2] Part of Noodles' crossclaim against Zurich and Zurich's entire crossclaim against Noodles remain. The Court suspects, however, that the crossclaims are no longer viable given the disposition of Nunn's claims.

1. Nunn's motion for partial summary judgment [Docket No. 102] is DENIED.

2. Noodles' motion for summary judgment on Nunn's claim [Docket No. 70] is GRANTED.

3. Zurich's motion for summary judgment on Nunn's claim [Docket No. 81] is GRANTED.

4. Zurich's motion for partial summary judgment on Noodles' crossclaim [Docket No. 112] is GRANTED.

Dated: November 23, 2010

                                              s/ Joan N. Ericksen
                                              JOAN N. ERICKSEN
                                              United States District Judge